**Joe HOLLIDAY, Plaintiff,**

v.

**Richard SCHWEIKER, Secretary of Health and Human Services, Defendant.**

No. 82 C 3381.

United States District Court, N.D. Illinois, E.D.

May 17, 1983.

Deborah Spector, Chicago, Ill., for plaintiff.

James J. Kubik, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

WILL, District Judge.

Joe Holliday and the Secretary of Health and Human Services (the Secretary) have filed cross motions for summary judgment, seeking review of the denial, by an Administrative Law Judge (the ALJ), of Holliday's applications for a period of disability and disability insurance benefits and Supplemental Security Income (SSI) benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423 and 1381. Our jurisdiction and Holliday's cause of action arise under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, we deny the Secretary's motion and we grant Holliday's motion to the extent that he asks us to reverse the ALJ's decision and to remand his case for rehearing.

Holliday filed an application for a period of disability and disability insurance benefits on October 7, 1980, and an application for SSI benefits on December 30, 1980, alleging that on September 30, 1980, he became disabled and unable to work because of a "back problem" and varicose veins in both legs (R. 40). The applications were denied initially (R. 79–90) and on reconsideration (R. 49–51) by the Office of Disability Operations upon the evaluation by a physician and by a disability examiner from the Illinois Bureau of Disability Adju-

dication Services of a medical report (to that state agency) by another physician. (*See* R. 81) On December 18, 1981, the ALJ held a *de novo* hearing, at which Holliday was represented by counsel. The ALJ found that Holliday was not under a disability (R. 5–11). The ALJ's decision became the final decision of the Secretary when the Appeals Council approved it on April 6, 1982 (R. 2).

Holliday was born in Mississippi on July 27, 1936. He was therefore forty-five years old both at the time of the ALJ's decision and at the time that that decision became the Secretary's final decision. Holliday attended a rural Mississippi school to the eighth grade (R. 20, 29), but describes his ability to read and write as "rather poor" (R. 29). He can sign his own name (*see, e.g.,* R. 12, which appears to contain a copy of Holliday's signature), but does not write anything else (R. 29). He could not read the notices which he received from the Social Security Administration, and had his sister read them to him. He does not read the daily newspaper or do any other reading (R. 29). According to Holliday, there is "not much" that he can read (R. 29).

Most of Holliday's past employment consisted of repairing and recapping truck tires (R. 29, 70). Tire repair required him to lift tires, some of which weighed up to 250 pounds, required him to stand or walk during nearly all of his work day, and required constant bending and reaching (R. 30, 71). Apparently, whatever reading and judg-

ment that this job might otherwise call for was exercised by Holliday's boss rather than by Holliday. According to Holliday, his boss would instruct him as to the proper size of the rims to be placed inside the tires which Holliday recapped (R. 30). Holliday's other past employment consisted of driving a tow truck, scrubbing floors, washing cars, and being a janitor (R. 58, 70).

On September 30, 1980, Holliday stopped working because "my legs would swell and I'd give out. I was having dizzy, dizzy spells" (R. 22). He has not worked since that time.

In October of 1980, Holliday was examined by Dr. Henry T. Pimental, whose "Peripheral Vascular Report" to the (Illinois) Bureau of Disability Adjudication Services notes that Holliday had varicose veins in both legs and lumbar disc syndrome (R. 81). This report indicates that Holliday had "distortion of veins and sacculation" and stassis dermatitis,[1] but had no temperature changes, atrophy, or intermittent claudication.[2] Dr. Pimental's report also notes that Holliday was "unable to stand for long periods of time," and that Holliday's pain was "moderate" but "increases with standing long periods" (R. 81–82). Dr. Pimental also noted that Holliday had a "slightly stiff" gait, but that ambulation was "normal" and not dependent upon the use of a cane or crutch. No decalcification, compression fraction, vertebral dislocation, or spinal ankylosis[3] were evident. The report indicates that Holliday's response to treatment was

---

1. "Stassis dermatitis" is "erythema and scaling of the lower extremities due to impaired circulation and other factors, such as nutritional edema." Stedman's Medical Dictionary 381 (5th Lawyers' ed. 1982). "Erythema" is an "inflammatory redness of the skin." *Id.* at 484. "Edema" is "an accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities." *Id.* at 443. Definitions of medical terms, like definitions of legal terms and like petitions for attorneys' fees in civil rights litigation, are sometimes "nests of Chinese boxes." *See Muscare v. Quinn,* 680 F.2d 42, 44 (7th Cir.1982).

2. "Claudication" is "limping" and usually appears as part of the term "intermittent claudication." Stedman's Medical Dictionary 286 (5th Lawyers' ed. 1982). "Intermittent claudi-

cation," also known as Charcot's syndrome or as myasthenia angiosclerotica, is "a condition caused by ischemia of the muscles due to sclerosis with narrowing of the arteries; it is characterized by attacks of lameness and pain, brought on by walking, chiefly in the calf muscles; however, the condition may occur in other muscle groups." *Id.* "Ischemia" is a "local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply." *Id.* at 728.

3. "Ankylosis" is the "stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." Stedman's Medical Dictionary 81 (5th Lawyers' ed. 1982).

"fair," but that his condition was "deteriorating" (R. 81). Dr. Pimental declined to recommend surgery, but wrote no reason for that decision (R. 83).

Dr. Mila Bacalla, a physician retained by the Social Security Administration, examined Holliday on June 10, 1981 (R. 84). Holliday complained of low back pain, hypertension, pain in the legs, and nervousness (R. 84). Dr. Bacalla noted that Holliday's "general appearance" was that of a well developed, slightly obese, cooperative patient in no acute distress (R. 85). There was no evidence of joint swelling, but Dr. Bacalla reported severe varicosities bilaterally, appearing in cords in both legs. There were nodules along the veins, particularly on the left side, and severe dermatitis, especially on the left leg, but no edema (R. 86–87). The left calf also appeared tender, and there was a positive Homan's sign [4] and a positive Trendelenburg's test [5] for the left leg (R. 86). Dr. Bacalla noted that Holliday "elevates his legs most of the time to relieve the discomfort" (R. 84). He concluded that "[t]hese clinical findings impose restriction as far as the patient's prolonged ambulation is concerned" (R. 87).

Dr. Bacalla noted that Holliday had normal posture, with some tenderness in the lumbosacral region with some paravertebral muscle spasm (R. 86). X-rays of the lumbosacral spine showed lipping [6] at L3, L4, and L5 (R. 88). Dr. Bacalla noted that Holliday walked with a limp towards the left side with a poor ability to walk on his heels and toes, but observed that Holliday had no difficulty dressing or undressing, getting on or off the examining table, or rising from a sitting position (R. 85).

Holliday informed Dr. Bacalla that he is able to walk about one block and climb one flight of stairs, and that bending, stooping, lifting, and prolonged walking aggravate his pain (R. 84, 87). Holliday described his pain as aching and constant, and radiating from his lower back through his legs, and also told Dr. Bacalla that he has occasional headaches and frequent dizziness (R. 84).

Dr. Bacalla stated that with regard to Holliday's nervousness, there was no evidence of any acute psychotic symptoms or any previous mental or emotional treatment (R. 87). Dr. Bacalla noted that Holliday had been taking medication for pain and for high blood pressure, but that his supply of medicines had run out (R. 84).

At his hearing, Holliday stated that due to lack of money he was no longer under a physician's care and no longer took any medication (R. 22). He complained of pain in his back and in his legs (R. 23). Holliday stated that his legs swell and that he "sit[s] around and elevate[s]" his legs to relieve the swelling (R. 24). Holliday estimated that he could sit "around [without elevating his legs] about 20, maybe about 20, 25 minutes" at one time (R. 23), and could stand "maybe about half an hour" (R. 24). According to Holliday, Dr. Pimental told him that his varicose veins were "too bad to operate on" (R. 32).

Holliday stated that he has frequent dizzy spells, and had had such a spell "on the elevator there a few minutes ago" (R. 23). He claimed to be able to walk "about a block" without stopping to rest (R. 24), but stated that he is able to lift "groceries or something like that . . . [m]aybe 20 or 25 pounds" (R. 25).

Holliday also claimed that he experiences pain in his chest and in his right hand (R. 23). The pain in his hand interferes with his grip (R. 23). Holliday is right handed (R. 20).

**4.** "Homan's sign" is a "slight pain at the back of the knee or calf when the ankle is slowly and gently dorsiflexed (with the knee bent), indicative of incipient or established thrombosis in the veins of the leg." Stedman's Medical Dictionary 1288 (5th Lawyers' ed. 1982).

**5.** "Trendelenburg's test" indicates congenital dislocation of the hip or hip abductor weakness. Stedman's Medical Dictionary 1290 (5th Lawyers' ed. 1982).

**6.** "Lipping" is simply "the formation of a lip-like structure as at the articular end of a bone in osteoarthritis." Stedman's Medical Dictionary 803 (5th Lawyers' ed. 1982).

Holliday lives with his sister at her house (R. 20). His sister does all the shopping (R. 25); as Holliday puts it, there "[a]in't much I can do around the house" (R. 24). Holliday has a driver's license, but no longer drives (R. 25).

The ALJ concluded on the basis of this evidence that although Holliday's varicose veins did not match the degree of severity sufficient for a per se finding of disability under 20 C.F.R. § 404.1520(d) and Rule 4.12 of Appendix 1 to Subpart P of the social security regulations, his varicose veins prevent his return to his past work, all of which required substantial periods of walking or standing (R. 9–10). However, the ALJ concluded that Holliday retains the capacity for "sedentary work" within the meaning of that term of art as defined by 20 C.F.R. §§ 404.1567 and 416.967. The ALJ relied upon Holliday's statement that he could lift objects weighing 20 to 25 pounds. The ALJ also noted that although

> [t]he claimant testified to discomfort above the ankles after prolonged sitting . . . the attending physician mentioned no limitation on the claimant's capacity for sitting nor any necessity for him to elevate his legs. The Administrative Law Judge finds that the claimant retains the capacity to tolerate sedentary work, which contemplates occasional changes of posture.

(R. 10).

The ALJ then concluded that Rules 201.-18 and 201.19 of Table 1 of Appendix 2 to Subpart P of the social security regulations directed a finding that Holliday was not disabled. As Judge Posner noted in *Cummins v. Schweiker,* 670 F.2d 81, 83 (7th Cir.1982), Rule 201.18 provides that

if the applicant is 45–49 years of age, has limited or less education but is at least literate and able to communicate in English, has either no previous work experience or previous work experience limited to unskilled labor, and in his present condition is capable at most of sedentary labor as defined in 20 C.F.R. § 404.-1567(a) . . . then he is—not disabled. That is the end of the case.

As Judge Posner explained, Appendix 2 is "a matrix of the four factors [the heaviest type of substantial gainful work that a claimant can do; his age; his education; and his previous work experience] that section 423 makes relevant to deciding whether an individual who is disabled from doing his previous work . . . can find other substantial gainful work." 670 F.2d at 82. Under this system, the ALJ classifies the applicant for each of the four factors in accordance with definitions provided elsewhere in the regulations, finds the appropriate combination of factors listed on one of the rows (such as Rules 201.17, 201.18, or 201.19) of the "matrix," and enters the conclusion which the matrix directs as to whether the claimant is or is not disabled. Appendix 2 enables the ALJ to avoid case by case inquiry into "the existence of jobs in the national economy" which the claimant can perform. Subpart P, Appendix 2 § 200.00(b). For any claimant, "when all factors coincide with the criteria of a particular rule, the existence of such jobs is established." *Id.*

Judge Posner noted, however, that the "grid" of Appendix 2 divests the ALJ of all discretion only where the claimant's condition exactly fits the elements of a particular rule. 670 F.2d at 82 and at 84. Indeed, the Introduction to Appendix 2 explicitly states as much.[7] Moreover, *Cummins* posed

7. Section 200.00(a) of Appendix 2 of Subpart P of the Social Security regulations states, in pertinent part:

> Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled. However, each of these findings of fact is subject to

rebuttal and the individual may present evidence to refute such findings. Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled. In any instance where a rule does not apply, full consideration must be given to all of the relevant facts of the case in accordance with the definitions

a challenge to thè Secretary's authority to devise the "mechanical approach" implemented by the current regulations and their appendices. *Id.* at 83. Holliday, however, does not challenge the validity of these regulations, but merely argues that they were applied erroneously to his case. Here the ALJ's conclusion that either Rule 201.18 or Rule 201.19 applied to Holliday and that both rules direct a verdict of "not disabled" is not "the end of the case" for it is dependent upon subsidiary findings which must, of course, be "supported by substantial evidence based on the record as a whole" if they (and the ALJ's ultimate conclusion that Holliday was not disabled) are to be sustained. *Whitney v. Schweiker,* 695 F.2d 784 at 786 (7th Cir.1982).

One of those subsidiary findings is the decision that Holliday retains the capacity to do "sedentary work." The second such subsidiary finding is the ALJ's conclusion that "the record does not establish that the claimant is iliterate" [sic] (R. 10). The ALJ reasoned that Holliday

> has limited ability in reading and writing but he did attend school over a period of eight years and the record does not reflect a total lack of capacity for reading and writing. The claimant has stated that he takes Social Security notices to a sister for interpretation but this circumstance does not establish iliteracy. [Sic] Many persons with considerably higher levels of education find it difficult to interpret the occasionally opaque prose of social security correspondence.

(R. 10).

Additionally, the ALJ concluded that Holliday's "work as a tire recapper or truck driver would appear to fall within the area of semi-skilled work but would require more than sedentary exertional capacity" (R. 10). The conclusion that Holliday's past work was "semi-skilled" is relevant in part to whether Rule 201.18 or Rule 201.19 is appropriate to Holliday's case. Rule 201.19 matches Judge Posner's description, *supra,* of Rule 201.18 except that 201.19 applies to claimants whose previous work experience

is skilled or semi-skilled and whose skills are not transferrable. Logically, just as 201.18 directs a verdict of "not disabled" where it applies, so 201.19 directs that same verdict where it applies. However, the ALJ's conclusions as to the skill level of Holliday's previous work experience and his level of education are also relevant to whether Rule 201.17 (rather than 201.18 or 201.19) applies to him. Rule 201.17 provides that a claimant who is 45 to 49 years of age, is illiterate or unable to communicate in English, and whose previous work experience is limited to unskilled work shall be deemed "disabled" regardless of any "residual capacity" (which might be inferred from the record) to do "sedentary work."

■ Holliday has not performed any "substantial gainful activity" since September 30, 1980. As indicated, the ALJ concluded that Holliday is no longer capable of performing his past work. At that point, Holliday met his burden under the social security laws, and the burden shifted to the Secretary "to prove that there is available some other kind of 'substantial gainful employment' the claimant can perform." *Whitney,* at 786.

■ If a claimant's impairment meets the durational requirement of 42 U.S.C. § 423(d)(1)(A) (twelve months or expected to last twelve months or to result in death) and is listed in Appendix 1 of the regulations or is the medical equivalent of a listed impairment, the claimant is entitled to a per se finding of disability. 20 C.F.R. § 404.1503(d); *see Perez v. Schweiker,* 653 F.2d 997, 999 (5th Cir.1981). Here, the ALJ concluded that Holliday "has no impairment which meets a listing set out in Appendix 1 to Subpart P, Regulation No. 4, nor are there combined impairments which equal in severity any listed impairment" (R. 9). The only listing which Holliday's condition might possibly meet is Rule 4.12, which describes the degree of severity required for a per se finding of disability on the basis of varicose veins:

and discussions of each factor in the appro-       priate sections of the regulations.

*Chronic venous insufficiency* of the lower extremity with incompetency or obstruction of the deep venous return, associated with superficial varicosities, extensive brawny edema, stassis dermatitis, and recurrent or persistent ulceration which has not healed following at least 3 months of prescribed medical or surgical therapy.

The ALJ noted that Holliday "has severe varicose veins bilaterally with stassis dermatitis," but he concluded that Holliday's condition did not meet the degree of severity required by Rule 4.12 apparently because there was "no recent ulceration or brawny edema" (R. 9). The ALJ also concluded that Holliday had "no impairments which in combination equal in severity any listed impairment." *Id.*

■ A fair reading of Holliday's medical records and the transcript of his disability hearing supports the contention that his condition, although severe, did not match the requirements of Rule 4.12 due to the absence of any mention (with reference to Holliday's varicosities) of edema, whether "extensive [and] brawny" or otherwise. Indeed, one report notes an absence of edema (R. 87). Similarly, the record does not reflect "recurrent or persistent ulceration," but merely that the area of his varicosities becomes tender (R. 28). We conclude that substantial evidence supports the ALJ's finding that a per se finding of disability under Rule 4.12 was not appropriate in this case.

■ However, we conclude that the ALJ's findings upon which he based his reliance upon Rules 201.18 and 201.19 of Appendix 2 of the regulations are not supported by substantial evidence. The ALJ based his decision that Holliday has a "limited education" and is able to read and write simple messages solely upon Holliday's eighth grade education. The regulations recognize that for most cases, an eighth grade education supports an infer-

ence of basic literacy and constitutes a "limited education."

*Limited education.* Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in·semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. §§ 404.1564(b)(3) and 416.-964(b)(3). The same regulations[8] define "illiteracy" as

the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

*Id.* at 404.1564(b)(1) and 416.964(b)(1).

Sections 404.1564(b) and 416.964(b) recognize, however, that

[f]ormal education that you completed many years before your impairment began, or unused skills and knowledge that were a part of your formal education, may no longer be useful or meaningful in terms of your ability to work. Therefore, the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities.

■ At most, one's numerical grade level gives rise to a rebuttable presumption of basic literacy. Holliday testified that, despite his 8th grade schooling in Mississippi, there is "not much" that he can read and apparently nothing that he does read. He also stated that he can write his own name, but nothing else. Apparently, none of Hol-

---

**8.** The regulations in part 404 of 20 C.F.R. govern disability claims by applicants insured under the social security system. The regulations in part 416 of 20 C.F.R. govern claims for SSI disability benefits. The two parts are very sim-

ilar. Indeed, many of the corresponding provisions of parts 404 and 416 are exactly the same. *See Wallschlaeger v. Schweiker,* 705 F.2d 191, 196, (7th Cir.1983).

liday's jobs required him to be able to read or write anything. Holliday's rebuttal of the presumption of literacy established by his educational level could have been strengthened by other examples (besides Social Security notices) of items which Holliday is unable to read, but the Secretary (through the ALJ) had the obligation to develop the record further on the issue of Holliday's literacy once Holliday had adduced evidence sufficient "to contradict" the inference that his "numerical grade level . . . completed in school . . . represent[s] . . . [his] actual educational abilities." 20 C.F.R. §§ 404.1564(b) and 416.964(b).

■ It is difficult to determine on the basis of this record whether Holliday is unable to read and write simple messages or whether he is merely not inclined to read and write and has never been required to use or demonstrate his abilities. Given the Secretary's conclusion that Holliday is unable to do his past work, however, the Secretary bore the burden of showing that Holliday retains the capacity to engage in less demanding "substantial gainful activity." Although the current regulations (including their appendices) enable the Secretary "to streamline the adjudication of social security disability cases and bring about some greater uniformity in the results of these adjudications," *Cummins,* 670 F.2d at 83, they do not alter the procedure by which the burden of proof in these cases may shift from the claimant to the Secretary.

■ The ALJ's finding that Holliday's past work was "semi-skilled" rather than "unskilled" labor is similarly unsupported by substantial evidence. The regulations define "unskilled work" as

work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in

30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. §§ 404.1568(a) and 416.968(a). "Semi-skilled work" is defined as

work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

20 C.F.R. §§ 404.1568(b) and 416.968(b).

■ Here, the ALJ determined, without any explanation, that Holliday's "work as a tire recapper or truck driver would appear to fall within the area of semi-skilled work . . ." (R. 10). The regulatory definitions of "unskilled work" and "semi-skilled work," when read together, suggest that although there is not a sharp and distinct line which separates the one classification from the other, a determination of the appropriate classification of particular work calls for some inquiry into length of training, independence of judgment, attention to or understanding of processes, and complexity of duties performed. No such inquiry is reflected in the ALJ's decision, even though Holliday's own testimony regarding his duties as a truck tire recapper appears to be more consistent with the definition of "unskilled" work than with that of "semi-skilled" work.

We note that 20 C.F.R. §§ 404.1566(e) and 416.966(e) give the ALJ discretion to enlist the aid of a "vocational expert" to resolve questions which relate to a claimant's work skills. That subsection states:

*Use of vocational experts and other specialists.* If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.

Given the importance of skill classification as one of the variables which determine the answer dictated by Appendix 2, the use of a vocational expert may be the only way to determine the level of skill needed to perform a particular kind of work where there is some doubt in the ALJ's mind (as appears to have been the case here) about the proper classification.

■ Finally, the ALJ's finding that Holliday has "the residual functional capacity" to perform sedentary work is not supported by substantial evidence based on the record as a whole. According to 20 C.F.R. §§ 404.1567(a) and 416.967(a), "sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

The definition of "light work" indirectly sheds further light on the nature of "sedentary work":

> *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, *unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.*

20 C.F.R. §§ 404.1567(b) and 416.967(b). [Emphasis added.]

The ALJ relied upon Holliday's statement that he can lift "maybe 20 or 25 pounds" and concluded that he could therefore do light work but for his "limited ability to stand and walk" (R. 10). Noting that "the attending physician mentioned no limitation on the claimant's capacity for sitting nor any necessity for him to elevate his legs on a constant basis," the ALJ found that Holliday "retains the capacity to tolerate sedentary work, which contemplates occasional changes of posture." *Id.*

In view of "the record as a whole" we cannot agree that Dr. Pimental's failure to indicate any restriction on Holliday's ability to sit without having to elevate his legs constitutes substantial evidence in support of a finding that Holliday was capable of performing sedentary work. The record does not reflect any treatment or examination of Holliday by Dr. Pimental after October of 1980, some 14 months before Holliday's hearing and the ALJ's decision.[9] In

9. It is not clear whether the ALJ's reference to Dr. Pimental as Holliday's "attending physician" is accurate. The only evidence in the record of Dr. Pimental's treatment of Holliday is Dr. Pimental's report, dated October 23, 1980, and written on a form provided by and addressed to the (Illinois) Bureau of Disability Adjudication Services. It is a reasonable inference from the form of this report and from the lack of evidence as to any continuing treatment of Holliday by Dr. Pimental that Dr. Pimental's

relationship to Holliday was similar to Dr. Bacalla's relationship to Holliday, that of a doctor examining a patient in order that officials who adjudicate disability claims would have some medical data and observations on which to base their decision regarding that patient's claim for disability benefits. On the basis of this record, it is probably inaccurate to state that Dr. Pimental was Holliday's "attending physician" or otherwise imply that Dr. Pimental was Holliday's personal physician or that

the interim, Dr. Bacalla, the physician retained by HHS, noted that Holliday "elevates his legs most of the time to relieve the discomfort" (R. 84). Additionally, Holliday testified to elevating his legs frequently (R. 24 and 33). In light of Dr. Pimental's observation that Holliday's condition was "deteriorating" and in the absence of any evidence that Holliday's condition could be corrected or alleviated by available surgery or treatment, we conclude that the ALJ placed undue reliance on what Dr. Pimental failed to say although Dr. Bacalla did refer to it.

Furthermore, the ALJ failed to address Holliday's complaints of dizzy spells, and pain in his chest and in his right hand, or to consider these complaints in connection with Holliday's other impairments. All of these complaints are particularly relevant to Holliday's "residual capacity" to do "sedentary work," given the caveat in §§ 404.-1567(b) and 416.967(b), *supra,* that a person able to lift and carry objects commensurate with the requirements of "light work" may not actually be able to do "sedentary work" if incapable of fine dexterity or of sitting for long periods of time. Interestingly, paragraph (h) of the introduction to Appendix 2, in cautioning that certain individuals "who do not meet all the criteria of a particular rule" may nonetheless "not have the ability to perform a full range of sedentary work," gives the following example:

> Example 1: An individual under age 45 with a high school education can no longer do past work and is restricted to unskilled sedentary jobs because of a severe medically determinable cardiovascular impairment (which does not meet or equal the listings in Appendix 1). A permanent injury of the right hand limits the individual to sedentary jobs which do not require bilateral manual dexterity. None of the rules in Appendix 2 are applicable to this particular set of facts, because this individual cannot perform the full range of work defined as sedentary. Since the inability to perform jobs requiring bilateral manual dexterity sig-

nificantly compromises the only range of work for which the individual is otherwise qualified (i.e., sedentary), a finding of disabled would be appropriate.

On its face, the transcript of Holliday's hearing suggests that he may be an embodiment of the above example. For that reason—and because of the inadequate inquiry into the frequency of Holliday's dizzy spells, the nature and frequency of his chest pains, and the frequency with which he must elevate his legs—we conclude that the ALJ's finding that Holliday retains the capacity for sedentary work is not supported by substantial evidence. On the contrary, one gets the clear impression from reading the ALJ's findings and the transcript that the ALJ selected those portions which were consistent with a predetermined conclusion of non-disability and ignored those which were not.

If upon rehearing, the ALJ concludes that Holliday is no longer capable of sedentary work, there would of course be no need to inquire into either Holliday's ability to read and write or the level of skill required by his past work. If a claimant lacks "the residual functional capacity" to perform "sedentary work," then "that is the end of the case" and reference to the matrix of Appendix 2 is unnecessary. *See Cummins,* 670 F.2d at 82–83; *Perez,* 653 F.2d at 1002; *see also Wallschlaeger v. Schweiker,* 705 F.2d 191, (7th Cir.1983).

For the reasons stated above, we deny the Secretary's motion, and we grant the plaintiff's motion insofar as it asks us to reverse the ALJ's decision and to order a rehearing. Accordingly, we reverse the ALJ's denial of Holliday's applications for a period of disability and disability insurance benefits and Supplemental Security Income benefits, and we remand this case to the ALJ for a rehearing consistent with this opinion. An appropriate order will enter.

---

there was an ongoing physician-patient relationship here.