**John GULAN, Plaintiff,**

v.

**Margaret HECKLER, Secretary of Health and Human Services, Defendant.**

**No. 83 C 3128.**

United States District Court, N.D. Illinois, E.D.

April 5, 1984.

---

Daniel Galatzer, Lamet Galatzer & Associates, Chicago, Ill., for plaintiff.

James P. White, Asst. U.S. Atty., Chicago, Ill., for defendant; Donna Morros Weinstein, Health and Human Services, Regional Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

WILL, District Judge.

This is an action brought under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final determination of the Secretary of Health and Human Services denying the plaintiff's application for disability insurance benefits and Supplemental Security Income under 42 U.S.C. §§ 416(i), 423, 1381, *et seq.* Both parties have moved for summary judgment. Plaintiff requests, in the alternative, remand for further proceedings. Because there is a genuine issue of material fact remaining, Fed.R.Civ.P. 56, and because the Administrative Law Judge's (ALJ) decision, that plaintiff is not "disabled" for purposes of the Supplementary Security Income claim, is not supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), we reverse and remand for further proceedings consistent with this opinion.

### I.

In order for plaintiff to be entitled to the requested benefits, he must first show that he is "disabled." Sections 223(d)(1) and 1614(a)(3)(A) of the Social Security Act define disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Sections 223(d)(3) and 1614(a)(3)(C) of the Act define a physical or mental impairment as an "impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

Sections 404.1520(c) and 416.920(c) of Social Security Administration Regulations Nos. 4 and 16, respectively, 20 C.F.R. §§ 404.1520(c) and 416.920(c), provide that if an individual does not have any impairments which *significantly limit* physical or mental ability to do basic work activities, a finding shall be made that the individual does not have a severe impairment and, therefore, is not disabled regardless of age, education, and work experience.

Basic work activities are defined as the abilities and aptitudes necessary to do most jobs. Examples of these abilities and aptitudes include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.-1521(b) and 416.920(b).

## II.

The undisputed facts show that Gulan is a thirty-five year old man with three years of high school. He attended carpentry trade school and worked as a carpenter for two years. The plaintiff's last reported earnings were in 1972, but the record shows that he has worked at several odd jobs since 1972. Since 1976, the plaintiff has not been engaged in any substantial gainful employment. (R. 12) Presently, the plaintiff lives with a female friend. To help pay his rent, he has helped his landlady perform various tasks. (R. 40) In addition, the plaintiff's mother occasionally sends him some money in the mail. (R. 40)

The plaintiff has a history of hospitalization for psychiatric problems prior to 1980. He was hospitalized once in 1966 at the age of 18 at the Forest Hospital, once in 1967 at the age of 19 at Elgin State Hospital, and once in 1976 at the age of 28 in a South Carolina hospital. Since 1980, the plaintiff has been examined by three psychiatrists.

At the request of the Social Security Administration, the plaintiff was examined twice by Dr. Brady, M.D., S.C. On November 14, 1980, the first of the two examinations, Dr. Brady stated that the plaintiff was "reasonably well groomed, but has a mild body odor" and "wore a rather old suit but it was in fairly good condition and was not tattered." (R. 89) Dr. Brady diagnosed the plaintiff as suffering from an "atypical personality disorder." (R. 90) Dr. Brady found that there was no evi-

dence of delusions, hallucinations, or loosening of associations. (R. 90) Dr. Brady concluded his evaluation of the plaintiff by stating, "I judge him capable of performing simple, routine, repetitive tasks at a competitive rate with a normal amount of supervision responding appropriately to supervisors and coworkers [sic], responding appropriately to customary work pressures in a routine work setting, and understanding, carrying out and remembering instructions." (R. 90)

On April 2, 1981, Dr. Brady again examined the plaintiff and described his formal mental status in part as follows:

He had a prominent body odor. His hair was very dirty and oily and unkempt looking. His clothes were somewhat dirty and he wore a loud Madras shirt that was wrinkled. His glasses were held together with scotch tape where they had been broken in the past. He had an unkempt looking beard and mustache. He had a mild degree of restlessness. His mood and affect were moderately severely anxious and mildly depressed. The affect was restricted in range and appropriate to the content of his speech. His speech was moderately overproductive, of increased spontaneity, or normal rate and was moderately pressured. There was no evidence of delusions, hallucinations, or loosening of associations. He had a tendency to ramble on and on, giving a lot of unnecessary detail. As such, I think he had circumstantial thinking. (R. 91, 92)

Dr. Brady diagnosed the plaintiff as suffering from a "Generalized Anxiety Disorder (Anxiety Neurosis) and Atypical Personality Disorder". (R. 92) Notwithstanding the foregoing, Dr. Brady again concluded his medical report on the plaintiff with an identical, apparently boiler plate, paragraph stating that the plaintiff was "able to perform simple, routine, repetitive tasks at a competitive rate...." (R. 92) Impliedly, Dr. Brady found that the plaintiff was able to engage in substantial gainful activity.

The plaintiff began treatment at the St. Joseph Community Health Center on April 21, 1981. Dr. Rosenberg examined him there on three separate occasions: April 21, 1981, May of 1981, and June 12, 1981. Dr. Rosenberg diagnosed the plaintiff as suffering from "paranoid schizophrenia" (R. 95) and filed the following medical report with the Social Security Administration:

Patient was first hospitalized at age eighteen for one year at Elgin State Hospital. Patient has been involved with St. Joseph Community Mental Health Clinic since April 21, 1981. He is currently seeing Dr. B. Rosenberg once a month for medication evaluation and attends the day treatment program three days per week. He is currently extremely paranoid and we are attempting to regulate his medication to alleviate some of the paranoia. It is undetermined at this point how long John will need to continue in therapy. *He is not able to take care of himself at this point, his appearance is extremely disheveled and dirty, his train of thought is very loose, he is not able to concentrate and at this point is completely unable to seek employment. I would have to say that John is severely impaired at this time.* (R. 94) [Emphasis added]

In addition, in the "Supplemental Questionnaire As To Residual Functional Capacity" submitted into the record, Dr. Rosenberg found the plaintiff to be *"severly impaired"* [1] in his ability to relate to other people, estimated degree of deterioration in personal habits, and ability to perform work requiring frequent contact with others; *"moderately severely impaired"* in his estimated degree of restriction of daily activities (*i.e.*, work around the house, ability to socialize with friends and neighbors), estimated degree of constriction of interests, ability to perform work requiring frequent contact with others, ability to perform tasks of a complex or repetitious or varied nature; and *"moderately im-*

*paired"* in his ability to perform simple tasks. (R. 97)

A third psychiatrist, Dr. Alexander Sinavsky, M.D., D.P.M. (London), has also examined the plaintiff. Dr. Sinavsky has submitted his office notes, his medical opinion, and the raw scores of the Hoffer-Osmond diagnostic test into the record. (R. 115) The plaintiff was first seen by Dr. Sinavsky on June 10, 1981, about the same time as he was examined by Dr. Rosenberg. Dr. Sinavsky examined the plaintiff again on July 17, 1981, August 19, 1981, and June 24, 1982. During the course of these examinations he noted that the plaintiff was "depressed, paranoid, dysperceptive, and that there was pressure of thought." (R. 99–103)

On September 28, 1982, in a letter (medical opinion) submitted into the record, Dr. Sinavsky reported that the plaintiff was under treatment for "Paranoid Schizophrenia." The plaintiff's symptoms included: "Paranoid Delusions, Ideas of Persecution, and unusual behavior." Dr. Sinavsky also reported that he had administered the Hoffer-Osmond diagnostic test to the plaintiff and the raw scores showed that he was suffering from "Depression, Paranoia, Perceptual Changes and Schizophrenia." (R. 111, 115) Dr. Sinavsky concluded that the plaintiff was "unable to hold any job as to be gainfully employed in any way because of his disease." (R. 115)

### III.

It is well established that proof of disability for purposes of the Social Security Act is a two-step process. First, a medically determinable impairment must be shown to exist and, second, there must be a factual determination that the impairment renders the plaintiff unable to perform any substantial gainful employment. 42 U.S.C. §§ 1382c(a)(3)(A), (B); *Lieberman v. Califano*, 592 F.2d 986, 989 (7th Cir.1979). In the present case, the ALJ found that the

---

**1.** *"Severely impaired"* is defined as an "extreme impairment of ability to function." *"Moderately severely impaired"* is defined as an "impairment which severely affects ability to function."

*"Moderately impaired"* is defined as an "impairment which affects but does not preclude ability to function." (R. 97)

evidence of record failed to establish that the claimant suffered from any impairment which would significantly limit his ability to perform basic work activities. (R. 14) Accordingly, the ALJ found that the claimant was not disabled. (R. 14, 15)

The only issue before this Court is whether the final decision of the Secretary is supported by substantial evidence. In *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), the United States Supreme Court defined "supported by substantial evidence" as being "more than a mere scintilla." It means "such relevant evidence as a reasonable mind might expect as adequate to support a conclusion." *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir.1980). If the findings of the Secretary as to any fact are supported by substantial evidence, then they are conclusive. Section 205(g), 42 U.S.C. § 405(g).

■ Gulan's motion for summary judgment or remand is based upon a two-pronged argument. First and foremost, he contends that the ALJ erred in selective evaluation of his psychological disorders; specifically that the ALJ erroneously and arbitrarily selected the earlier medical report of Dr. Brady, the Secretary's consulting physician, over the later reports of treating physicians Sinavsky and Rosenberg. Second, plaintiff contends that the ALJ similarly erred in finding that he had refused to take his medications without "good cause." We agree with both of plaintiff's contentions and hold that the Secretary's decision to deny the plaintiff Supplemental Security Income benefits is not supported by substantial evidence. We agree, however, with the Secretary's decision that the plaintiff has failed to sustain the burden of proof that he was disabled prior to September 30, 1976, when he last met the special earnings requirements for

Social Security Disability Payments.[2] We therefore grant the defendants' motion for summary judgment as to that issue only because the ALJ's conclusion on that issue is supported by substantial evidence.

■ A number of decisions have emphasized that a disability denial, in order to be supported by substantial evidence, must at least indicate why any evidence favorable to the claimant was not credited or deemed to be controlling. *See, e.g., Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir.1982); *Holndoner v. Schweiker*, 542 F.Supp. 739, 742 (N.D.Ill.1982); *Garcia v. Califano*, 463 F.Supp. 1098, 1105 (N.D.Ill.1979). And it is well-settled that remand may be ordered if the ALJ fails to make specific findings as to why some evidence was accepted and some rejected, or whenever the ALJ bases her decision on only part of the record. *See Tillman v. Weinberger*, 398 F.Supp. 1124, 1130 (N.D.Ind.1975).

The weight accorded a physician's testimony depends upon the extent to which it is supported by clinical evidence and laboratory diagnostic techniques. 20 C.F.R. § 404.1526; *Lieberman v. Califano*, 592 F.2d 986, 989 (7th Cir.1979). The legislative history surrounding the 1967 amendments requiring that a "physical or mental impairment" be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques" specifically states:

Statements of the applicant or conclusions by others with respect to the nature or extent of impairment or disability do not establish the existence of disability … unless they are supported by clinical or laboratory findings or other medically acceptable evidence confirming such statements or conclusions.

1967 U.S.Code Cong. & Ad.News 2834, 2882–83.

---

2. The plaintiff himself apparently agrees with this conclusion:

It is probably fair to say that on this record there is substantial evidence that the claimant was not disabled by his mental impairment prior to September 30, 1976, when he last met the special earnings requirements for Social

Security (Title II). There is no evidence of hospitalization or treatments between 1976 and 1981.... Thus, it is fair for the Administrative Law Judge to find that there is insufficient evidence to prove by a preponderance of the evidence that Gulan was disabled in 1976.

■ Therefore, a statement by a physician that a claimant is disabled or unable to work does not mean that the Social Security Administration will determine that the claimant is disabled; review of the medical findings and other evidence supporting a physician's statement of disability is necessary. 20 C.F.R. § 404.1527. However, if the ALJ concludes that a treating physician's evidence is credible, she should give it controlling weight in the absence of evidence to the contrary because of the treating physician's greater familiarity with the plaintiff's conditions and circumstances. *Whitney v. Schweiker,* 695 F.2d 784, 789 (7th Cir.1982); *Carter v. Schweiker,* 535 F.Supp. 195, 203–04 (S.D.Ill.1982).

■ Here, the ALJ failed to state why she accepted and found credible Dr. Brady's earlier report, rather than the diagnoses of Drs. Rosenberg and Sinavsky. Although Dr. Brady, notwithstanding numerous findings to the contrary, concluded that the plaintiff was capable of performing substantial gainful employment, both Dr. Rosenberg and Dr. Sinavsky, who were treating physicians, concluded that he was not. The ALJ's decision fails to state adequately why she rejected the later medical opinions of both treating physicians. Nowhere in her decision did the ALJ state that either treating physician lacked credibility or appeared to be "leaning over backwards" to find for the plaintiff. *See, e.g., Cummins v. Schweiker,* 670 F.2d 81, 84 (7th Cir.1982). Instead, the ALJ concluded "the evidence is clear that he [the plaintiff] is capable of performing simple repetitive tasks, capable of responding appropriately to supervisors, co-workers, and customary work pressures and capable of understanding, carrying out and remembering instructions." (R. 13) On the contrary, in light of the medical reports of treating physicians Sinavsky and Rosenberg and Dr. Brady's specific findings, we believe that the evidence is anything but "clear." Although the ALJ may weigh evidence, she must consider all of it in her decision. She may not ignore competent evidence that suggests an opposite conclusion. *Garcia v. Califano,* 463 F.Supp. 1098 (N.D.Ill. 1979).

■ The ALJ stated that "the letter of September 28, 1982, from Dr. Sinavsky received into evidence subsequent to the hearing is merely conclusory in nature without giving objective, clinical findings as required by the regulations." (R. 14) Surprisingly, however, the ALJ noted that Dr. Sinavsky had administered the Hoffer-Osmond diagnostic test to the plaintiff and the results showed depression, paranoia, perceptual changes and schizophrenia. (R. 13) Nowhere in her decision did the ALJ question the competency of the Hoffer-Osmond diagnostic test. Dr. Sinavsky's medical opinion, although not extremely detailed, was clearly based on objective, clinical diagnostic techniques obtained from four examinations and the raw scores of the Hoffer-Osmond diagnostic test, as required by the regulations, and the ALJ's statement to the contrary is clearly erroneous.

Even more perplexing is the ALJ's failure to mention why the medical opinion of treating physician Rosenberg was accorded little or no weight. Because Dr. Rosenberg is a treating physician and because the ALJ may not ignore evidence that suggests an opposite conclusion, we believe that the ALJ erred in failing to do so. In these circumstances, we believe remand, if not reversal, to be proper. *Garcia v. Califano, supra,* 463 F.Supp. at 1103–04.

IV.

In the alternative, the ALJ also found that the evidence of record disclosed that the plaintiff had failed to follow prescribed treatment without good cause. (R. 15) However, in order to deny the plaintiff his requested benefits, the government must show four elements: that there is (1) a treatment prescribed; (2) which if followed would cause the plaintiff to improve such that he will no longer be disabled; (3) that he has refused treatment; and (4) that the refusal is wilful and without good cause. 20 C.F.R. § 404.1530 (1983); *Jackson v. Secretary of HEW,* 319 F.Supp. 385 (N.D.

Ohio 1970). We have searched the record and have found little, if any, evidence to support elements (2), (3) and (4). While we recognize that Dr. Sinavsky did note that the plaintiff "refuses to take medication," there is no indication that it was a prescribed treatment which, if followed, would cause the plaintiff to improve such that he would no longer be disabled or that the refusal was wilful and without good cause. (R. 102) In fact, the plaintiff's testimony at the hearing suggests that he was following what he in good faith believed to be the prescribed treatment:

> ALJ: Okay, let the record show that the claimant has submitted a list that he prepared of the medication he takes this will be marked as Exhibit "INAUDI-BLE"
>
> CLAIMANT: I think my medication right now today is a little different than that list there because that was last year—
>
> ALJ: Are taking milerill (PHONETIC), are you still taking milerill?
>
> CLAIMANT: No your honor why is milerill on that list?
>
> ALJ: Milerill is on the list, are you taking nycobid (PHONETIC)?
>
> CLAIMANT: Yes yes your honor, well the doctor told me I did not have to take that milerill if I didn't want to.
>
> ALJ: Alright are you taking pirodolcyn (PHONETIC)?
>
> CLAIMANT: Yes your honor.

**3.** The record shows that the plaintiff is both unresponsive and very disturbed. For example, the plaintiff testified in part as follows:

> CLAIMANT: This is again your honor part of this case I'm trying to lidigate [sic] with the Federal Bureau of Investigation as to my own personal what's been going on in my own life professionally and personally since I was in high school circumstances surrounding my case. Also one thing I didn't mention and maybe I should take this up with the doctor is when I get under a tremendous amount of stress I can hardly breathe.
>
> ALJ: "INAUDIBLE" The FBI?
>
> CLAIMANT: Well I'm trying to get this straightend [sic] out why my why my parents have been doing this and why these people here in the city that have been threatening me if there is some kind of a connection because

> ALJ: Are you taking Zincglyuclamate (PHONETIC)?
>
> CLAIMANT: Vitamin B–6 is the pirodolcyn.
>
> ALJ: Are you taking vitamin C?
>
> CLAIMANT: Yes your honor.
>
> ALJ: Are you taking Stress Tabs?
>
> CLAIMANT: Yes your honor, except that since I haven't had any money and since I haven't been eating properly the past few months I've neglected to take my vitamins because I don't think they do me any good if I'm not eating, in other words there are suppose to be used in conjunction with my meals and if I'm not eating three meals a day how can I take my vitamins after every meal. (R. 48, 49)

The ALJ stated in her opinion that "it is reasonable to assume that prior to April 1981, his [the plaintiff's] paranoia was at least controlled with medication." However, we have searched the record and have found not a scintilla of evidence to support the ALJ's assumption. (R. 13) We, therefore, hold that the ALJ's decision that the plaintiff has failed to follow prescribed treatment without good cause is not based on substantial evidence and must be reversed.

Finally, we are troubled by the ALJ's language that, at the hearing, the plaintiff "for the most part responded to questions in a rational, coherent, and reasonable manner." (R. 14) Our examination of the record suggests a contrary conclusion.[3]

> my parents have been threatened by people too, because I have a very hight [sic] IQ and I feel like people are trying to keep me out of professional fields somehow or other by threatening my life, future cause that I might have to relocate to another part of the country to get away from this element I dont [sic] know, I had job offers I was offered a job by a gentleman in Nuclear Reactors inspecting nuclear reactors and did quite a bit of writing and the following day I was accosted by two thugs on the street who come to pull me into an alley and they were going to do me in for talking with this person. (R. 51)

In addition, the plaintiff did not remember his current address when asked. (R. 33) In response to questions as to whether he lives in an apartment or a house, the plaintiff responded by describing threats on his life and the FBI's in-

On remand, a *different* ALJ should determine whether Mr. Gulan's mental impairments meet or equal a list impairment in Appendix 1, §§ 12.03, 12.04.[4] Full consideration should be given to Dr. Sinavsky's and Dr. Rosenberg's opinions as treating physicians, that the plaintiff is extremely paranoid and depressed and therefore unable to seek any substantial gainful employment or, at the least, the ALJ should state why he/she does not find the opinions of these treating physicians credible.

Once again, as we have in the past, we are constrained to observe that the ALJ's performance here strongly suggests a strained effort to reach a predetermined decision denying benefits if any evidence, however slight, can be found to support such a conclusion.[5] In the process, the ALJ has made findings which are clearly contrary to the record (such as that Dr. Sinavsky's diagnosis was not based on objective, clinical findings) or have no basis in the record (such as that prior to April 1981 plaintiff's paranoia was controlled by medication). The ALJ's performance falls far short of the level of objective and fair justice that judges in the United States are expected to achieve. The reasons for these apparently frequent unjudicial performances by HEW Administrative Law Judges are not clear although there have been suggestions that they are the result of pressures brought to bear on them by executives in the department for political and fiscal reasons.[6] If this is the case, it

---

volvement in those threats. (R. 33–34) Several times during the hearing the plaintiff described his attempts to litigate with the FBI. (R. 34, 39, 41, 51) The plaintiff believes that it is necessary that he learn Latin in order to break the language barrier and to substantiate the threats that have been made against his life. (R. 44) The plaintiff believes that he experiences mild heart attacks on a weekly basis. (R. 38)

4. Appendix 1, in relevant part, defines a mental impairment:

12.03 *Functional psychotic disorders (mood disorders, schizophrenias, paranoid states ).* With A and B:
A. Manifested persistence of one or more of the following clinical signs:
1. Depression (or elation); or
2. Agitation; or
3. Psychomotor disturbances; or
4. Hallucinations or delusions; or
5. Autistic or other regressive behavior; or
6. Inappropriateness of affect; or
7. Illogical association of ideas;
B. Resulting persistence of marked restriction of daily activities and constriction of interests and seriously impaired ability to relate to other people.
12.04 *Functional nonpsychotic disorders* (psychophysiological, neurotic, and personality disorders; addictive dependence on alcohol or drugs). With both A and B:
A. Manifested persistence of one or more of the following clinical signs:
1. Demonstrable and persistent structural changes mediated through psychophysiological channels (e.g., duodenal ulcer); or
2. Recurrent and persistent periods of anxiety, with tension, apprehension, and interference with concentration and memory; or
3. Persistent depressive affect with insomnia, loss of weight, and suicidal preoccupation; or

4. Persistent phobic or obsessive ruminations with inappropriate, bizarre, or disruptive behavior; or
5. Persistent complusive [sic], ritualistic behavior; or
6. Persistent functional disturbance of vision, speech, hearing, or use of a limb with demonstrable structural or trophic changes; or
7. Persistent, deeply ingrained maladaptive patterns of behavior manifested by either:
a. Seclusiveness or autistic thinking; or
b. Pathologically inappropriate suspiciousness or hostility;
B. Resulting persistence of marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people.

5. *Cf. Ruyle v. Heckler,* No. 82 C 6241, slip op. at 11–12 (N.D.Ill. Aug. 30, 1983) ("Because we find that the ALJ's inquiry was inadequate and because we get the clear impression from reading the ALJ's findings and the record that the ALJ selected those portions which were consistent with a predetermined conclusion of non-disability and ignored those which were not, further and fuller inquiry is necessary on remand.") *See also Deuters v. Schweiker,* No. 82 C 5292 (N.D.Ill. July 28, 1983) and *Holliday v. Schweiker,* 563 F.Supp. 1272, 1282 (N.D.Ill.1983) in which we commented at greater length on the same unjudicial technique.

6. *See, e.g., Benefit Rulings Criticized,* Chi.Trib. at 6, col. 3 (Sept. 26, 1983) (the SSA is subtly intimidating judges by ordering reviews and increased caseloads unless they had a record of upholding disability payment cutoffs); *Disability-Benefit Cases Flood Courts,* Nat'l L.J. at 1

should stop. There is no room in our system of justice for Nazi or Soviet-type misuse and abuse of judges and no ALJ should be exposed or succumb to such pressure.

### CONCLUSION

For the reasons stated, the ALJ's findings that the plaintiff does not suffer from any impairment which would significantly limit his ability to perform basic work activities and consequently is not "disabled" for purposes of the Supplementary Security Income claim is not based on substantial evidence, and is therefore reversed and remanded. Defendant's motion for summary judgment is, however, granted as to the claim of disability income benefits *only*, because the ALJ's decision as to that issue is based on substantial evidence. An appropriate order will enter.

(October 17, 1983) (reporting a suit by federal administrative law judges in the State of Washington charging the SSA with pressuring law judges to reduce the number of times they reverse agency determinations and award benefits to claimants). One United States Senator notes that administrative law judges are voicing concerns about pressure being placed upon them by SSA officials and that Congress has received complaints that agencies are establishing quotas on ALJs, as well as reviewing their reversal rate of agency decisions. Legislation is now pending before Congress to create an independent administrative judge corps, S. 1275. Heflin, *Query: Should federal administrative law judges be independent of their agencies?*, 67 Judicature 369, 412, 413 (March 1984), *reprinted in* Chi.Daily L.Bull. at 3, col. 2 (April 2, 1984).